### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
#### ORLANDO DIVISION

ANITA FIGUEROA,

          **Plaintiff,**

-vs-                             **Case No. 6:05-cv-1209-Orl-JGG**

COMMISSIONER OF SOCIAL
SECURITY,

          **Defendant.**

_____

## MEMORANDUM OF DECISION

Plaintiff Anita Figueroa ["Figueroa"] appeals to the district court from a final decision of the Commissioner of Social Security [the "Commissioner"] denying her application for a period of disability and supplemental security income benefits. *See* Docket No. 1 (complaint). For the reasons set forth below, the Commissioner's decision is **REMANDED** pursuant to sentence four of 42 U.S.C. 405 (g).

## I.    PROCEDURAL HISTORY

On October 23, 2002, Figueroa filed a claim for supplemental security income benefits, claiming disability as of July 15, 2001 due to diabetes mellitus, back pain and spasms, asthma, diabetes, and depression. R. 45, 57. Her claim was denied initially, R. 38, and upon reconsideration, R. 34. On October 13, 2004, the Honorable R. Neil Lewis, Administrative Law Judge ["ALJ"], held a brief hearing on Figueroa's claim in Orlando, Florida. R. 284 - 94. Non-attorney Lori Raybon represented Figueroa at the hearing. R. 19, 284. The ALJ heard testimony from Figueroa. R. 285.

On February 22, 2005, the ALJ issued a decision that Figueroa was not disabled and not entitled to benefits.  R. 19 - 25.  Following a review of the medical and other record evidence, the ALJ found that Figueroa had no past relevant work.  R. 24, Finding 6.  The ALJ found that Figueroa nevertheless retained the residual functional capacity ["RFC"] to perform the full range of the physical exertional requirements of light work.  R. 24, Finding 9.  Applying the Medical-Vocational Guidelines, the ALJ concluded that Figueroa was not disabled.  R. 24, Findings 10, 12.

On June 15, 2005, the Appeals Council denied review.  R. 5.  On August 19, 2005, Figueroa timely appealed the Appeals Council's decision to the United States District Court.  Docket No. 1 at 1.  On February 11, 2006, Figueroa filed in this Court a memorandum of law in support of her appeal. Docket No. 11.  On April 24, 2006, the Commissioner filed a memorandum in support of her decision that Figueroa was not disabled.  Docket No. 12.  The appeal is ripe for determination.

## II.   THE PARTIES' POSITIONS

Figueroa assigns three errors to the Commissioner.  First, Figueroa claims that the Commissioner erred by failing to elicit the testimony of a vocational expert in light of Figueroa's severe non-exertional impairments.  Docket No. 11 at 6 - 8.  Figueroa argues that the Commissioner failed to meet her burden to establish that Figueroa could perform other work in the national economy. *Id.*  Second, Figueroa claims that the Commissioner erred by failing to properly evaluate Figueroa's subjective complaints as supported by the objective medical evidence.  *Id.* at 8 - 10.  Third, Figueroa contends that the Commissioner erred by failing to fully and fairly develop the record.  *Id.* at 9 - 10. According to Figueroa, the Commissioner should have ordered a consultative examination to evaluate Figueroa's mental impairments.  *Id.* at 10.

The Commissioner argues that substantial evidence supports her decision to deny disability. First, the Commissioner argues that Figueroa's non-exertional impairments were not severe and did not significantly compromise her ability to perform light work activity.  Docket No. 12 at 7 - 9. Second, the Commissioner counters that the ALJ properly evaluated Figueroa's subjective complaints, and that the objective medical evidence supports the ALJ's credibility determination.  *Id.* at 10 - 11. Third, the Commissioner argues that the evidence of record supports the ALJ's determination that Figueroa's mental impairments were not severe and that a consultative psychological examination was unnecessary.  *Id.* at 12 - 13.

### III.  **THE STANDARD OF REVIEW**

#### A.  **AFFIRMANCE**

The Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla — i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *accord*, *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.  *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir.

1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord*, *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

### B.     REVERSAL

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause. 42 U.S.C. § 405(g)(Sentence Four). The district court will reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Department of Health and Human Services*, 21 F.3d 1064, 1066 (11th Cir. 1994); *accord, Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). This Court may reverse the decision of the Commissioner and order an award of disability benefits where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt. *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord*, *Bowen v. Heckler*, 748 F.2d 629, 631, 636 - 37 (11th Cir. 1984). A claimant may be entitled to an immediate award of benefits where the claimant has suffered an injustice, *Walden v. Schweiker*, 672 F.2d 835, 840 (11th Cir. 1982), or where the ALJ has erred and the record lacks substantial evidence supporting the conclusion of no disability, *Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985).

###     C.     REMAND

The district court may remand a case to the Commissioner for a rehearing under sentence four

of  42 U.S.C. § 405(g); under sentence six of 42 U.S.C. § 405(g); or under both sentences.  *Jackson*

*v. Chater*, 99 F.3d 1086, 1089 - 92, 1095, 1098 (11th Cir. 1996).  To remand under sentence four, the

district court must either find that the Commissioner's decision is not supported by substantial

evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim.

*Jackson*, 99 F.3d at 1090 - 91 (remand appropriate where ALJ failed to develop a full and fair record

of claimant's residual functional capacity); *accord, Brenem v. Harris*, 621 F.2d 688, 690 (5th Cir.

1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for

district court to find claimant disabled).

Where the district court cannot discern the basis for the Commissioner's decision, a sentence-

four remand may be appropriate to allow the Commissioner to explain the basis for his decision.

*Falcon v. Heckler*, 732 F.2d 872, 829 - 30  (11th Cir. 1984) (remand was appropriate to allow ALJ

to explain his basis for determining that claimant's depression did not significantly affect her ability

to work) (treating psychologist acknowledged that claimant had improved in response to treatment and

could work in a supportive, non-competitive, tailor-made work environment).  On remand under

sentence four, the ALJ should review the case on a complete record, including any new material

evidence.  *Diorio v. Heckler*, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to

consider psychiatric report tendered to Appeals Council); *Reeves v. Heckler*, 734 F.2d 519, 522 n.1

(11th Cir. 1984) (ALJ should consider on remand the need for orthopedic evaluation).  After a

sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction. *Jackson*, 99 F.3d at 1089, 1095.

In contrast, sentence six of 42 U.S.C. § 405(g) provides:

> The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding;

42 U.S.C. § 405(g).  To remand under sentence six, the claimant must establish:  1.) that there is new, non-cumulative evidence; 2.) that the evidence is material — relevant and probative so that there is a reasonable possibility that it would change the administrative result; and 3.) there is good cause for failure to submit the evidence at the administrative level.  *See Jackson*, 99 F.3d at 1090 - 92;  *Cannon v. Bowen*, 858 F.2d 1541, 1546 (11th Cir. 1988);  *Smith v. Bowen*, 792 F.2d 1547, 1550 (11th Cir. 1986);  *Caulder v. Bowen*, 791 F.2d 872, 877 (11th Cir. 1986); *see also*, *Keeton v. Dept. of Health and Human Serv.*, 21 F.3d 1064, 1068 (11th Cir. 1994).

A sentence-six remand may be warranted even in the absence of an error by the Commissioner if new, material evidence becomes available to the claimant.  *Jackson*, 99 F.3d at 1095.  With a sentence-six remand, the parties must return to the district court after remand to file modified findings of fact.  *Jackson*, 99 F.3d at 1095.  The district court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings.[1]  *Id.*

---

[1] The time for filing an application for attorneys fees under the Equal Access to Justice Act, 28 U.S.C. § 2412 ["EAJA"] differs in remands under sentence four and sentence six. *Jackson*, 99 F.3d at 1089, 1095 n.4 and surrounding text. In a sentence-four remand, the EAJA application must be filed after the entry of judgment before the district court loses jurisdiction. *Id.* In a sentence-six remand, the time runs from the post-remand entry-of-judgment date in the district court. *Id.* Any Plaintiff intending to seek attorney's fees for past-due benefits under 42 U.S.C. § 406 (b)(1)(A) shall move the Court to include in any remand order an extension of the 14-day period described in Fed. R. Civ. P. 54 (d)(2)(B) so as to specify an extended deadline that follows the Commissioner's determination of Plaintiff's past-due benefits. *Bergen v. Comm'r of Soc. Sec.*, 454 F. 3d 1273, 1278 n.2 (11th Cir. 2006).

IV.   **THE LAW**

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.  The impairment must be severe, making the claimant unable to do his or her previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505 - 404.1511.

A.   **DEVELOPING THE RECORD**

The ALJ has a duty to fully and fairly develop the record.  *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988); *Cowart v. Schweiker*, 662 F.2d 731, 735 - 36 (11th Cir. 1981).  The Commissioner also has a duty to notify a claimant of the statutory right to retained counsel at the social security hearing, and to solicit a knowing and voluntary waiver of that right.  *See* 42 U.S.C.§ 406; *Cowart*, 662 F.2d at 734.  The obligation to fully and fairly develop the record exists if a claimant has waived the right to retained counsel, and even if the claimant is represented by counsel.  *See Cowart*, 662 F.2d at 735 - 36.

Where an unrepresented claimant has not waived the right to retained counsel, the ALJ's obligation to develop a full and fair record rises to a special duty.  *See Brown v. Shalala*, 44 F.3d 931, 934 - 35 (11th Cir. 1995), *citing Smith v. Schweiker*, 677 F.2d 826, 829 (11th Cir. 1982).  This special duty requires the ALJ to "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts" and to be "especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited."  *Cowart*, 662 F.2d at 735 (citations omitted).

### B.    THE FIVE STEP EVALUATION

The ALJ must follow five steps in evaluating a claim of disability.  *See* 20 C.F.R. §§ 404.1520, 416.920.  First, if a claimant is working at a substantial gainful activity, she is not disabled.  20 C.F.R. § 404.1520(b).  Second, if a claimant does not have any impairment or combination of impairments which significantly limit his or her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.  20 C.F.R. § 404.1520(c).  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.  20 C.F.R. § 404.1520(d).  Fourth, if a claimant's impairments do not prevent him or her from doing past relevant work, she is not disabled.  20 C.F.R. § 404.1520(e).  Fifth, if a claimant's impairments (considering his or her residual functional capacity, age, education, and past work) prevent him or her from doing other work that exists in the national economy, then claimant is disabled.  20 C.F.R. § 404.1520(f).

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments, and must consider any medically severe combination of impairments throughout the disability determination process. 42 U.S.C. § 423(d)(2)(B).  The ALJ must evaluate a disability claimant as a whole person, and not in the abstract as having several hypothetical and isolated illnesses.  *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993).  Accordingly, the ALJ must make it clear to the reviewing court that the ALJ has considered all alleged impairments, both individually and in combination, and must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled.  *See Jamison v. Bowen*, 814 F.2d 585, 588 - 89 (11th Cir. 1987); *Davis*, 985

F.2d at 534.  A remand is required where the record contains a diagnosis of a severe condition that the ALJ failed to consider properly.  *Vega v. Commissioner*, 265 F.2d 1214, 1219 (11th Cir. 2001).

The claimant has the burden of proving the existence of a disability as defined by the Social Security Act.  *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991).  If the claimant is unable to establish an impairment that meets the Listings, the claimant must prove an inability to perform the claimant's past relevant work.  *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999).  In this step, the ALJ assesses the claimant's residual functional capacity ["RFC"].  This assessment measures whether a claimant can perform past relevant work despite his or her impairment.  20 C.F.C. § 404.1520 (f); *see also, Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997).  The ALJ makes this determination by considering the claimant's ability to lift weight, sit, stand, push, and pull.  *See* 20 C.F.C. § 404.1545(b).

The ALJ first considers whether the claimant has the RFC to perform the functional demands and duties of a past job as actually performed by the claimant.  *See* SSR 82-61.  If so, the claimant is not disabled.  If not, the ALJ then considers whether the claimant can perform the functional demands of the job as it is generally performed in the national economy.  SSR  82-61.  In determining the physical exertional requirements of work available in the national economy, jobs are classified as sedentary, light, medium, heavy, and very heavy.  20 C.F.C. § 404.1567.

The claimant must prove disability on or before the last day of his or  her insured status for the purposes of disability benefits.  *Ware v. Schweiker*, 651 F.2d 408, 411 (5th Cir. 1981); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979); 42 U.S.C. §§ 416(i)(3); 423(a), (c).  If a claimant becomes disabled after losing insured status, the claim for disability benefits must be denied despite

the claimant's disability.  *See, e.g., Kirkland v. Weinberger*, 480 F.2d 46 (5th Cir. 1973); *Chance v. Califano*, 574 F.2d 274 (5th Cir. 1978).

### C.   OTHER WORK

Once the ALJ finds that a claimant cannot return to his or her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy.  *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995).  In determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant.  *Foote*, 67 F.3d at 1558; *Allen v. Sullivan*, 880 F.2d 1200, 1201 (11th Cir. 1989).  This burden may sometimes be met through exclusive reliance on the Medical-Vocational Guidelines [the "grids"].  *Foote,* 67 F.3d at 1558.

Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant non-exertional factors.  20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00 (e); *Foote*, 67 F.3d at 1559; *Heckler v. Campbell*, 461 U.S. 458 (1983) (exclusive reliance on the grids is appropriate in cases involving only exertional impairments, impairments which place limits on an individual's ability to meet job strength requirements).  Exclusive reliance is not appropriate, however, "either when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has a non-exertional impairment that significantly limits basic work skills."  *Walker v. Bowen*, 826 F.2d 996, 1002-03 (11th Cir. 1987).  In almost all of such cases, the Commissioner's burden can be met only through the use of a vocational expert.  *Foote*, 67 F.3d at 1559; *Chester v. Bowen*, 792 F.2d 129, 132 (11th Cir. 1986); *see also, MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986) (when non-exertional limitations

are alleged, the preferred method of demonstrating that the claimant can perform specific work is through the testimony of a vocational expert).

It is only when the claimant can clearly do unlimited types of work at a given residual functional level that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy. *See Allen v. Sullivan*, 880 F.2d 1200, 1202 (11th Cir. 1989); *Ferguson v. Schweiker*, 641 F.2d 243, 248 (5th Cir. 1981). In any event, the ALJ must make a specific finding as to whether the non-exertional limitations are severe enough to preclude a wide range of employment at the given work capacity level indicated by the exertional limitations. *Foote*, 67 F.3d at 1559.

### D.    TREATING PHYSICIANS

Absent the existence of "good cause" to the contrary, the ALJ must give substantial weight to the opinion, diagnosis and medical evidence of a treating physician. *See MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986); *Lewis v. Callahan*, 125 F.3d 1436, 1439 - 1441 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991); *Sabo v. Commissioner of Social Security*, 955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(d). If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527(d)(2).

The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. *See Edwards*, 937 F.2d 580 (ALJ properly discounted treating physician's report where the physician was unsure of the

accuracy of his findings and statements).  Similarly, the ALJ may reject any medical opinion if the evidence supports a contrary finding.  *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1986).  Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also, Schnor v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).

When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on the 1.) length of the treatment relationship and the frequency of examination; 2.) the nature and extent of the treatment relationship; 3.) the medical evidence supporting the opinion; 4.) consistency with the record a whole; 5.) specialization in the medical issues at issue; 6.) other factors which tend to support or contradict the opinion.  20 C.F.R. § 404.1527(d).  However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.  *See Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir.1984); *see also,* 20 C.F.R. § 404.1527(d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability.  20 C.F.R. § 404.1527(e).  The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or

the application of vocational factors because those ultimate determinations are for the Commissioner. 20 C.F.R. § 404.1527(e).

The ALJ must, however, state with particularity the weight given different medical opinions and the reasons therefore, and the failure to do so is reversible error. *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987). Without the ALJ making the necessary findings, it is impossible for a reviewing court to determine whether the ultimate decision is supported by substantial evidence. *Hudson v. Heckler*, 755 F.2d 781, 786 (11th Cir. 1985).

### E.    PAIN

Pain is a non-exertional impairment. *Foote*, 67 F.3d at 1559; 826 F.2d at 1003. Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment which could reasonably be expected to produce the pain or symptoms alleged. 42 U.S.C. § 423(d)(5)(A). The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence. 20 C.F.R. § 404.1529. In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the Eleventh Circuit's three-part "pain standard":

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Foote,* 67 F.3d at 1560, *quoting Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). Pain alone can be disabling, even when its existence is unsupported by objective evidence, *Marbury v. Sullivan*,

-13-

957 F.2d 837, 839 (11th Cir. 1992), although an individual's statement as to pain is not, by itself, conclusive of disability.  42 U.S.C. § 423(d)(5)(A).

## F.    CREDIBILITY

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. *Foote,* 67 F.3d at 1561-62*; Jones v. Dep't of Health and Human Services*, 941 F.2d 1529, 1532 (11th Cir. 1991) (articulated reasons must be based on substantial evidence).  A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.  *See Hale v. Bowman,* 831 F.2d 1007, 1012 (11th Cir. 1987); *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986).  As a matter of law, the failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be accepted as true.  *Foote,* 67 F.3d at 1561-62*; Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case.  *See Smallwood v. Schweiker*, 681 F.2d 1349, 1352 (11th Cir. 1982).  If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." *Foote v. Chater*, 67 F.3d at 1562 (quoting *Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir.1983) (although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court).

### G.    MEDICAL TESTS AND EXAMINATIONS

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled.  20 C.F.R. § 416.917; *see also, Conley v. Bowmen*, 781 F.2d 143, 146 (8th Cir. 1986).  In fulfilling his duty to conduct a full and fair inquiry, the ALJ is not required to order a consultative examination unless the record establishes that such an examination is necessary to enable the ALJ to render an informed decision.  *Holladay v. Bowen*, 848 F.2d 1206, 1209 (11th Cir. 1988); *Reeves v. Heckler*, 734 F.2d 519, 522 n. 1 (11th Cir. 1984) (failure to order such an evaluation may be reversible error).  Under the regulations, however, the ALJ may determine that a consultative examination or other medical tests are necessary.  20 C.F.R. § 416.917 (1998).

### H.    THE EVALUATION OF MENTAL DISORDERS

The evaluation of disability on the basis of mental disorders requires the documentation of a medically determinable impairment, as well as consideration of the degree of limitation such impairment may impose on the individual's ability to work.  The listings for mental disorders are arranged in nine diagnostic categories.  20 C.F.R. Pt. 404, Subpt. P, App. 1.   The criteria in paragraphs B and C of the listings for mental disorders describe those functional limitations associated with mental disorders which are incompatible with the ability to work — i.e. limitations in functional areas deemed essential to work.  A mental impairment is medically equivalent to a listed mental impairment if the medical findings are at least equal in severity and duration to the listed findings.  20 C.F.R. § 404.1526.  An individual meeting or equaling the criteria could not reasonably be expected to engage in gainful work activity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

-15-

Individuals who have an impairment with a level of severity which does not meet the criteria of the listings for mental disorders may or may not have the residual functional capacity ["RFC"] which would enable them to engage in substantial gainful work activity.  The determination of mental RFC is crucial to the evaluation of an individual's capacity to engage in substantial gainful work activity when the criteria of the listings for mental disorders are not met or equaled, but the impairment is nevertheless severe.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

For mental disorders, severity is assessed in terms of the functional limitations imposed by the impairment.  Functional limitations are assessed using the criteria in paragraph B of the listings for mental disorders (activities of daily living; social functioning;  concentration, persistence, or pace; and ability to tolerate increased mental demands associated with competitive work).  A "marked" degree of limitation means more than moderate, but less than extreme.  A marked limitation may arise when several activities or functions are impaired or even when only one is impaired, so long as the degree of limitation is such as to seriously interfere with the ability to function independently, appropriately and effectively.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The Commissioner employs a technique to ensure that ALJ's obtain, consider, and properly evaluate all evidence needed to evaluate mental impairment severity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The technique is used in connection with the sequential evaluation process.  *See* 20 C.F.R. §§ 404.1520a and 416.920a.

The presence of a mental disorder should be documented primarily on the basis of reports from individual providers, such as psychiatrists and psychologists, and facilities such as hospitals and clinics. 20 C.F.R. Pt. 404, Subpt. P, App. 1.  Information from both medical and non-medical sources may be used to obtain detailed descriptions of the individual's activities of daily living;  social

-16-

functioning;  concentration, persistence and pace;  or ability to tolerate increased mental demands (stress).  This information can be provided by programs such as community mental health centers, day care centers, and family members who have knowledge of the individual's functioning.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  In some cases descriptions of activities of daily living or social functioning given by individuals or treating sources may be insufficiently detailed and/or may be in conflict with the clinical picture otherwise observed or described in the examinations or reports.  It is necessary to resolve any inconsistencies or gaps that may exist in order to obtain a proper understanding of the individual's functional restrictions.

An individual's level of functioning may vary considerably over time.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The level of functioning at a specific time may seem relatively adequate or, conversely, rather poor.  Proper evaluation of the impairment must take any variations in level of functioning into account in arriving at a determination of impairment severity over time.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Thus, it is vital to obtain evidence from relevant sources over a sufficiently long period prior to the date of adjudication in order to establish the individual's impairment severity. 20 C.F.R. Pt. 404, Subpt. P, App. 1.  This evidence should include treatment notes, hospital discharge summaries, and work evaluation or rehabilitation progress notes if these are available.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Some individuals may actually have worked during the period of time pertinent to the determination of disability.  Information concerning the individual's behavior during any attempt to work and the circumstances surrounding termination of the work effort are particularly useful in determining the individual's ability or inability to function in a work setting.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

-17-

Particular problems are often involved in evaluating mental impairments in individuals who have long histories of repeated hospitalizations or prolonged outpatient care with supportive therapy and medication. 20 C.F.R. Pt. 404, Subpt. P, App. 1. Individuals with chronic psychotic disorders commonly have their lives structured in such a way as to minimize stress and reduce their signs and symptoms. Such individuals may be much more impaired for work than their signs and symptoms would indicate. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The results of a single examination may not adequately describe these individuals' sustained ability to function. It is, therefore, vital to review all pertinent information relative to the individual's condition, especially at times of increased stress. 20 C.F.R. Pt. 404, Subpt. P, App. 1. It is mandatory to attempt to obtain adequate descriptive information from all sources which have treated the individual either currently, or in the time period relevant to the decision. 20 C.F.R. Pt. 404, Subpt. P, App. 1.

Attention must be given to the effect of medication on the individual's signs, symptoms and ability to function. 20 C.F.R. Pt. 404, Subpt. P, App. 1. While psychotropic medications may control certain primary manifestations of a mental disorder, e.g., hallucinations, such treatment may or may not affect the functional limitations imposed by the mental disorder. 20 C.F.R. Pt. 404, Subpt. P, App. 1. In cases where overt symptomatology is attenuated by the psychotropic medications, particular attention must be focused on the functional restrictions which may persist. These functional restrictions are also to be used as the measure of impairment severity. 20 C.F.R. Pt. 404, Subpt. P, App. 1.

In some cases, the evidence shows that an individual's impairments are subject to temporary remission. In assessing whether medical improvement has occurred in persons with this type of

-18-

impairment, the ALJ will consider the longitudinal history of the impairments, including the occurrence of prior remission, and prospects for future worsening. Improvement in such impairments that is only temporary will not warrant a finding of medical improvement. 20 C.F.R. § 404.1594 (iv).

## V.   **APPLICATION AND ANALYSIS**

### A.   **THE FACTS**

Figueroa was born on November 9, 1967, and was thirty-seven years old on the date of the ALJ's decision to deny benefits. R. 19, 25, 286. Figueroa completed twelfth grade, and has past work experience as a cashier, housekeeper, and a packer in a factory. R. 58, 63. Figueroa has not worked in the past fifteen years. R. 58. Figueroa claims disability as of July 15, 2001 due to diabetes mellitus, asthma, back and stomach pain, headaches, anxiety, and panic attacks. R. 57, 98.

Figueroa submitted medical records from Saint Joseph Hospital in Reading, Pennsylvania covering the period from November 1990 through August 1999. R. 102 - 39. On November 3, 1990, Figueroa went to the hospital with shortness of breath and cold symptoms. R. 102. Figueroa was diagnosed with asthma and pneumonia; treated with medication and an inhaler; and was discharged. R. 102 - 06. Three years later, in March 1993, Figueroa returned to the hospital complaining of shortness of breath, wheezing, coughing, and abdominal pain. R. 112 - 14. Figueroa was five-months pregnant, and reported being asthmatic since childhood. R. 112. In August 1993, Figueroa underwent a Cesarian section without complications. R. 107 - 11.

In August 1997, Figueroa returned to the hospital with complaints of abdominal pain. R. 127. The doctor assessed "acute abdominal pain, etiology unclear," and treated her with Toradol for the pain. *Id.* In July 1998, Figueroa went to the hospital complaining of a headache and neck, nose, and

-19-

back pain after her husband pushed her down a flight of stairs.  R. 121 - 23.  The doctor diagnosed multiple contusions and closed head injury.  R. 123.  In June 1999, Figueroa underwent another Cesarian section.  R. 135 - 37.

Figueroa claims disability as of July 15, 2001.  R. 57, 98.  On October 2, 2001, Figueroa sought treatment with E. Lionel Nau, M.D.  R. 190 - 91.  Dr. Lau diagnosed obesity, diabetes mellitus, migraines, and chronic low back pain, and prescribed medication.  R. 190.[2]

Figueroa visited the Blue Trauma Surgery Service in early February with complaints of intermittent intense abdominal pain accompanied by nausea and vomiting.  R. 149.[3]  Figueroa underwent CT scans of her abdomen and pelvis at the Orlando Regional Healthcare System on February 6, 2002.  R. 140 - 41.  The abdominal CT scan revealed possible fatty liver, but otherwise normal results.  R. 140.  The pelvic CT scan showed a defect in the rectus muscle at the level of the anterior pelvic wall, as well as peritoneal fat that was herniated and inflamed.  R. 141.  According to the report, these findings were consistent with panniculitis (inflammation of subcutaneous fat).  *Id.*

Figueroa was admitted to Florida Hospital in mid-February 2002, and was transferred to Orlando Regional Medical Center on February 20, 2002.  R. 149.  Figueroa complained of persistent abdominal pain with nausea and vomiting, some constipation, anorexia, and problems with bowel movements.  R. 151.  Howard G. Smith, M.D., assessed a history of abdominal hernias with two ventral hernias in her lower abdomen.  R. 152, 154.  Dr. Smith, recommended surgery to repair the

---

[2]Figueroa submitted treatment notes from Dr. Nau, her primary care physician, covering the period from October 2001 through April 2004.  R. 183 - 91, 202, 249 - 62.  These notes are handwritten and mostly illegible.  *See id.*  The legible and relevant facts are included in this memorandum.

[3]Figueroa did not submit records from the Blue Trauma Surgery Service, but subsequent hospital records report this February 2002 visit.

hernias, as they were "extremely painful" but "easily reducible." R. 154. Figueroa underwent a ventral hernia repair procedure on February 20, 2002 without complications. R. 154 – 55. After the procedure, Figueroa was in stable condition, and began ambulating the following day. R. 149. She was discharged on February 23, 2002. *Id.*

Figueroa visited Dr. Nau on June 19, 2002 due to discomfort in her back. R. 186. On October 18, 2002, she returned with complaints of back pain and asthma. R. 185. Figueroa filed her application for benefits on October 23, 2002. R. 45, 57.

On January 3, 2003, Dr. Nau completed a questionnaire from the Office of Disability Determinations in which he opined that Figueroa could lift a maximum of twenty pounds and ten pounds frequently; stand or walk for six hours in an eight-hour workday; and sit for fifteen minutes at a time during each hour. R. 164 - 65. He stated that her gait was normal, but that she was limited in her abilities to push, pull, and climb. R. 164. The doctor further reported that she was compliant with her diabetes mellitus treatment, and that she had peripheral neuropathy in her right lower extremity. R. 165.

On January 10, 2003, Figueroa visited Robert Murrah, M.D., an orthopaedist, for an evaluation of her back pain. R. 171 - 72. Dr. Murrah's physical examination revealed a moderate amount of paralumbar muscular spasm and tenderness. R. 171. Figueroa exhibited 5/5 strength in her lower extremities, but she was only able to touch her mid-thighs when bending over at the waist with her knees extended. *Id.* Dr. Murrah assessed chronic back pain and lumbar strain and a possible herniated nucleus pulposus. *Id.* He recommended that Figueroa continue taking Naposyn, and that she undergo an MRI for further evaluation. *Id.*

On January 17, 2003, Figueroa underwent a lumbar spine MRI, which revealed an epidural mass on Figueroa's right spinal canal at approximately at the L5-S1 levels.  R. 168 - 69.  The MRI radiologist recommended further lumbosacral studies to determine the character of the epidural mass. R. 169.

Figueroa returned to Dr. Murrah on February 4, 2003 for a follow-up visit to discuss the test results.  R. 170.  Dr. Murrah explained that the MRI revealed a neural tumor at L5-S1 (that was likely a schwannoma or neurofibroma), and that a neurosurgical evaluation was necessary.  *Id.*  On February 5, 2003, Figueroa visited Dr. Nau who provided a referral for a neurological evaluation, as recommended by Dr. Murrah.  R. 184.

On February 14, 2003, Figueroa underwent a Spirometric Pulmonary Function Test  through the State of Florida Department of Health, Division of Disability Determinations.  R. 179.  The test revealed abnormal results, but ruled out an acute respiratory illness.  *Id.*

Augustine Joseph, M.D., performed a neurological evaluation on February 17, 2003.  R. 281. Figueroa reported experiencing lower back pain and numbness in the left leg for the previous nine years.  *Id.*  Figueroa also complained of insomnia, joint pain, depression, anxiety,  and headaches.  R. 282.  Dr. Joseph observed that her gait was slow and steady and that her straight leg raise test was negative.  *Id.*  She had mild tenderness in the cervical paraspinal muscles and tenderness in her lumbar paraspinal muscles.  *Id.*  The doctor assessed lumbosacral mass (probable nerve sheath tumor or neurofibroma) and lower back pain.  R. 281, 283.  He recommended a neurosurgical evaluation and Darvocet and Soma for the pain.  R. 283.

On February 18, 2003, Figueroa saw Dr. Nau due to a sore throat and joint pain.  R. 183.  She returned on March 24, 2003 and complained of low back pain.  R. 202.

On April 30, 2003, Alex Perdomo, M.D. evaluated Figueroa at the request of the Office of Disability Determinations.  R. 192 - 93.  Figueroa chiefly complained of low back pain, and reported that her pain radiated from her back to her lower extremities, which caused numbness and tingling.  R. 192.  She described the pain as constant, and stated that it increased with prolonged standing, sitting, walking or bending.  *Id.*  Dr. Perdomo assessed: 1.) a history of chronic low back pain with "moderate to severe musculoskeletal functional limitations on physical examination"; 2.) a history of lumbar spinal stenosis and a lumbar spinal tumor; 3.) diabetes, by history; 4.) asthma that was "poorly controlled"; and 5.) obesity.  R. 193.

Dr. Perdomo recommended that Figueroa lose weight and participate in a physical therapy and home exercise program.  *Id.*  He opined that Figueroa could "perform well in a sedentary type job avoiding standing or sitting for more than three to four hours a day, repetitive bending, or lifting over ten pounds."  *Id.*  He further stated that as a result of her asthma, Figueroa should avoid working in "dusty environments or exposure to extreme temperatures and humidity changes."  *Id.*  He also recommended "adequate continuity of care for proper management of her diabetes."  *Id.*

On May 19, 2003, upon referral from Dr. Nau, Figueroa saw German Montoya, M.D. for a neurosurgical evaluation related to her low back pain and spinal tumor.  R. 267.  Dr. Montoya diagnosed intraspinal tumor at L5-S1, and advised Figueroa to undergo a lumbar spine MRI for further evaluation.  *Id.*  The doctor also scheduled a follow-up visit to discuss surgical intervention.  *Id.*

A non-examining state agency physician completed a physical RFC assessment on May 22, 2003.  R. 164 - 201.  The physician opined that Figueroa could lift and/or carry twenty pounds occasionally and ten pounds frequently; stand, walk, and/or sit for approximately six hours in an eight-hour workday; and push and pull without limitation.  R. 195.  Figueroa could occasionally stoop and crouch, and otherwise had no postural, manipulative, visual, or communicative limitations.  R. 196 - 98.  Further, Figueroa had to avoid concentrated exposure to wetness, humidity, fumes, odors, gases, and poor ventilation.  R. 198.

The record also contains a second Physical RFC Assessment by a non-examining medical consultant for the Office of Disability Determinations, but the assessment is unsigned and undated. R. 203 - 10.  The unnamed consultant opined that Figueroa could lift and/or carry twenty pounds occasionally and ten pounds frequently; stand, walk, and/or sit for approximately six hours in an eight-hour workday; and push and pull without limitation.  R. 204.  Figueroa could frequently balance, kneel, and crawl; occasionally climb, stoop, and crouch; and had to avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation.  R. 205, 207.

Figueroa sought medication refills from Dr. Nau on three occasions between June 3, 2003 and August 29, 2003.  R. 257 - 60.  During these visits, Figueroa complained of experiencing headaches, back and cervical pain, and swelling in her legs.  *Id.*

On September 10, 2003, Figueroa underwent a lumbar myelogram for further evaluation of her tumor.  R. 276.  The myelogram showed fat containing an epidural mass at the L5-S1 regions with associated bony remodeling.  R. 278.  The impression was epidural lipoma.  *Id.*  On September 24, 2003, Figueroa returned to Dr. Montoya to discuss her MRI results.  R. 265.  According to Dr.

Montoya, the results revealed an epidural lesion on her spine that was either a tumor or a large disc herniation.  *Id.*  The doctor also discussed the risks of surgery.  *Id.*

Figueroa was admitted to the Orlando Regional Medical Center on September 26, 2003 to remove her tumor.  R. 211.  She underwent a lumbar laminectomy at L4 and L5 and an excision of epidural hemangioma.  R. 211 - 12.  According to Dr. Montoya, following surgery, Figueroa experienced "some bizarre" numbness and weakness in her right extremity, and continued to have "rather increased pain" throughout her hospital stay.  R. 211.  Figueroa was discharged on October 3, 2003, and was ambulatory "with some help."  *Id.*  Dr. Montoya noted that she encouraged Figueroa to undergo in-patient rehabilitation therapy, but that Figueroa declined.  *Id.*  Dr. Montoya therefore arranged out-patient physical therapy for Figueroa.  *Id.*

On October 22, 2003, Figueroa returned to Dr. Montoya for suture removal.  She was in a wheelchair and reported being able to stand for only a short period of time.  R. 264.  Figueroa was weak in her right leg, but showed no signs of infection.  *Id.*  Dr. Montoya prescribed medication for Figueroa's "pain and anxiety" and referred Figueroa to a physical therapy rehabilitation program.  *Id.*

On October 24, 2003, Figueroa visited Lakeside Alternatives to seek counseling and medication for depression.  R. 223 - 28.  According to her Intake Screening form (signed by an Assessment Specialist from Lakeside Alternatives), Figueroa reported a history of depression and symptoms of irritability, withdrawal, low energy, problems with concentration, anxiety, and confusion.  R. 223.  The Assessment Specialist diagnosed "Major Depressive Disorder, Single Episode Severe" and "Generalized Anxiety Disorder," and a current Global Assessment of Functioning ("GAF") score

of 40 on Axis V.[4]  R. 227.  The Assessment Specialist recommended an evaluation for medication and outpatient counseling.  *Id.*  On November 13, 2003, Figueroa returned to Lakeside Alternatives for another evaluation.  R. 213 - 21.  The Evaluator also diagnosed Depressive Disorder Not Otherwise Specified, and again assigned a GAF score of 40 on Axis V.  R. 219.  The Evaluator recommended individual counseling to help Figueroa's "depressed mood."  R. 220.

On December 29, 2003, Figueroa saw Dr. Montoya for a follow-up visit.  R. 263.  Figueroa continued to complain of right leg pain and headaches.  *Id.*  Dr. Montoya noted that Figueroa was ambulatory, but walked with a limp on her right side.  *Id.*  The doctor encouraged Figueroa to continue walking and lose weight, and recommended that she undergo a post-operative MRI of the lumbar spine and return in eight weeks for a follow-up visit.  *Id.*  Figueroa also visited Dr. Nau on the same day, and complained of neck and low back pain.  R. 254.  Dr. Nau prescribed medication.  *Id.*

On January 14, 2004, Figueroa went to the Health Central emergency room complaining of left hip, neck, and back pain after falling on a sloping ramp at a shopping mall.  R. 233 - 34, 236. Figueroa's physical examination was mainly normal, except for pain and swelling.  R. 234. Radiographs of Figueroa's left hip and lumbar and cervical spine were normal.  R. 240.  The emergency room doctor treated Figueroa with pain medications; diagnosed cervical and low back pain;

---

[4]DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (American Psychiatric Association 4th Ed. 1994) ["DSM-IV"].  The Global Assessment of Functioning ["GAF"] Scale describes an individual's overall psychological, social, and occupational functioning as a result of mental illness, without including any impaired functioning due to physical or environmental limitations.  DSM-IV at 32.  A GAF code of 41 - 50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting), or serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).  DSM-IV at 32.  A GAF code of 31 to 40 is worse — the individual has some impairment in reality testing or communication, or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood. DSM-IV at 32.

and discharged Figueroa in "stable" condition. R. 235, 238. The doctor also excused Figueroa from work for three days. R. 243.

Figueroa visited Dr. Nau twice in January and February 2004 for follow-up visits due to her fall. R. 252 - 53. Figueroa continued to complain of back pain, neck pain and headaches. R. 253. On March 5, 2004, Figueroa returned to Dr. Nau for medication. R. 251. She also complained of headaches and numbness of the right leg. R. 251. Figueroa's physical examination was mostly normal, and Dr. Nau noted that she displayed normal judgment, orientation, mood and affect, and memory. *Id.* Figueroa failed to appear for two appointments with Dr. Lau in March and April 2004. R. 249 - 50.

On April 20, 2004, Figueroa sought treatment at Nandra Family Physicians, P.A. ["Nandra"] for chronic low back pain. R. 232. The doctor prescribed Zoloft for depression, and noted that Figueroa was "mildly wheezy" during the visit due to her asthma. R. 232. On May 18, 2004, Figueroa returned to Nandra with complaints of pain in her ribs and back. R. 230. She reported having heartburn, daily migraines, and wheezing, but stated that her depression was "much better." *Id.* The doctor prescribed medications. *Id.*

On July 20, 2004, Florida Hospital admitted Figueroa after she fainted and "blacked out." R. 245. Figueroa stated that she was crossing the street before she fainted, and that she could not remember what happened next. *Id.* A CT of her chest revealed a segmental defect in the right lower lobe, which showed a possible pulmonary embolism. R. 247. CT of the pelvis showed a right inguinal nodule which was possibly a lymph node. *Id.* The doctor recommended tests to follow-up on the

possibly pulmonary embolysm, and also assessed: 1.) syncopal episode (fainting), 2.) chest pain, and 3.) type 2 diabetes.  *Id.*

On August 17, 2004, Figueroa returned to Nandra for medication refills because she had lost her prescription.  R. 229.  A physical examination was mostly normal, although she was still wheezing. *Id.*

Figueroa testified at the hearing before the ALJ on October 13, 2004.  R. 286 - 94.  She explained that she began feeling "very sick" due to her diabetes as of July 2001.  R. 287 - 88.  Figueroa stated that as a result of her asthma, she feels "suffocated" when she walks, and that when she is outside, she cannot breathe and vomits.  R. 288.  Figueroa also complained of experiencing stabbing back pains, migraines, and stomach cramps, and stated that she lies down most of each day due to her ailments.  R. 289 - 90, 292 - 93.  She further testified that she receives counseling and medication for her depression from Lakeside Alternatives.  R. 291.

## B.    THE ANALYSIS

First, Figueroa first claims that the Commissioner failed to meet her burden to establish that Figueroa could perform other work in the national economy, and argues that the ALJ erred by exclusively relying on the grids.  Docket No. 11 at 6 - 8.  According to Figueroa, the ALJ should have heard testimony from a VE in light of Figueroa's severe non-exertional impairments, namely her need to alternate between sitting and standing and her need to avoid exposure to dust and extreme changes in temperature and humidity (as articulated by Dr. Perdomo).  *Id.*  The Commissioner responds by arguing that the ALJ correctly determined that Figueroa's non-exertional impairments were not severe and did not significantly compromise her ability to perform the full range of light work activity.

Docket No. 12 at 7 - 9.  The Commissioner also argues that Figueroa's asthma was "mild," and that Dr. Perdomo did not opine that Figueroa needed to alternate between sitting and standing.  *Id.* at 8.

Exclusive reliance on the grids is not appropriate when a claimant is unable to perform a full range of work at a given residual functional level, or when a claimant has a non-exertional impairment that significantly limits basic work skills.[5]  The ALJ must make a specific finding as to whether the non-exertional limitations are severe enough to preclude a wide range of employment at the given work capacity level indicated by the exertional limitations.  Environmental limitations (such as the need to avoid exposure to dust or changes in temperature and humidity) are non-exertional impairments.[6]  Further, the ALJ should generally consult a VE when a claimant must alternate periods of sitting and standing.[7]  Light work involves:

> lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be

---

[5] Social Security Ruling 83-10 defines "full range of work" as all or substantially all occupations existing at a given exertional level.  SSR 83-10.

[6] A non-exertional impairment is any impairment that does not directly affect the ability to sit, stand, walk, lift, carry, push, or pull. Social Security Ruling 83-10. Non-exertional impairments thus include postural, manipulative, visual, communicative, and environmental limitations.  *Id.*; *see also* 20 C.F.R. § 416.945(d).

[7] Social Security Rule 83-12 provides, in relevant part, that:

In some disability claims, the medical facts lead to an assessment of RFC which is compatible with the performance of either sedentary or light work except that the person must alternate periods of sitting and standing . . . . Such an individual is not functionally capable of doing either the prolonged sitting contemplated in the definition of sedentary work . . . .
Unskilled types of jobs are particularly structured so that a person cannot ordinarily sit or stand at will. In cases of unusual limitation of ability to sit or stand, a [VE] should be consulted to clarify the implications for the occupational base.

SSR 83-12.

considered capable of performing a full or wide range of light work, [the claimant] must have the ability to do substantially all of these activities.

20 C.F.R. § 404.1567(b).

In this case, the ALJ found that Figueroa retained the RFC for "simple unskilled light work activity in a workplace free from lung irritants." R. 22 (emphasis added). The ALJ added, "This [RFC] is based on the medical evidence of record that shows [Figueroa] has asthma that is controlled with medication." R. 22. The ALJ, however, also found that "[Figueroa's] capacity for light work is substantially intact and has not been compromised by any nonexertional limitations." R. 24, Finding 11. The ALJ, "using [the Grids] as a framework for decision-making[,]" therefore concluded that Figueroa was not disabled. *Id.*

The ALJ thus included a non-exertional impairment in Figueroa's RFC, but failed to explain why her need to avoid lung irritants was not severe enough to preclude a wide range light work activity. Further, three physicians opined that Figueroa had environmental limitations due to her asthma, but the ALJ failed mention or state the weight he assigned to any of these medical opinions. Both non-examining state agency physicians stated that Figueroa had to avoid concentrated exposure fumes, odors, gases, and poor ventilation. R. 198, 207. One of these physicians stated that Figueroa also had to avoid concentrated exposure to wetness and humidity. R. 198. Dr. Perdomo, a consultative examining physician, opined that Figueroa should avoid working in "dusty environments or exposure to extreme temperatures and humidity changes." R. 193.

In fact, the ALJ never specified the weight he assigned to *any* of the physicians' opinions on Figueroa's impairments and limitations. *See* R. 19 - 25.[8]  The ALJ must state with particularity the weight given different medical opinions and the reasons therefore, and the failure to do so is reversible error.[9]  Although the Commissioner is correct that Dr. Perdomo did not opine that Figueroa needed to alternate between sitting and standing, Dr. Perdomo did opine that Figueroa had to avoid standing or sitting "for more than three to four hours a day." *Id.*  Also, Dr. Nau, a treating physician, opined that Figueroa could sit for fifteen minutes at a time each hour and that she was limited in her abilities to push, pull, and climb.  Without knowing the weights the ALJ assigned to these opinions, this Court cannot determine whether the decision is supported by substantial evidence.  Furthermore, this Court cannot determine that exclusive reliance on the Grids was proper, and that the Commissioner met her burden to establish that Figueroa could perform other work in the national economy.  Remand is necessary on this issue.

Figueroa also claims that the Commissioner erred by failing to properly evaluate Figueroa's subjective complaints, and that the Commissioner should have ordered a consultative examination to evaluate Figueroa's mental impairments.  Docket No. 11 at 8 - 10.  The Commissioner argues that the ALJ properly evaluated Figueroa's subjective complaints, and that Figueroa's mental impairment were not severe and that a consultative psychological examination was unnecessary.  Docket No. 12 at 12 - 13.

---

[8]The ALJ did explicitly reject the opinions on Figueroa's mental status expressed in the Lakeside Alternatives intake forms by pointing out the forms' internal inconsistencies and by noting that they were not signed by a psychiatrist or psychologist.  R. 20.

[9]In her memorandum before the Court, while Figueroa never explicitly seeks reversal and remand on this issue. Nevertheless, her argument that the ALJ improperly rejected or disregarded Dr. Perdomo's opinions encompasses the issue of the ALJ's failure to state the weight assigned to the medical opinions in the record.  *See* Docket No. 11 at 7 - 8.

In light of the remand, the Court need not address this issue.  Figueroa is free to supplement evidence of mental impairment on remand, and the Commissioner is free to re-evaluate whether her depression is severe.

## VI.    **CONCLUSION**

For the reasons stated above, this case is **REMANDED** to the Commissioner of Social Security pursuant to sentence four of 42 U.S.C. 405(g) for further proceedings consistent with this opinion. Substantive issues raised in Figueroa's Motion for Leave to File Supplemental Brief [Docket No. 15] may be addressed on remand, so the motion is **DENIED** as moot.  The Clerk should enter a judgment and close the case.

**DONE AND ORDERED** this 9th day of February, 2007.

JAMES G. GLAZEBROOK
UNITED STATES MAGISTRATE JUDGE

The Court Requests that the Clerk
Mail or Deliver Copies of this Order to
All Counsel of Record and *Pro Se* Litigants,
and to:

Mary Ann Sloan, Chief Counsel
Dennis R. Williams, Deputy Chief Counsel
Paul Jones, Assistant Regional Counsel
Office of the General Counsel, Region IV
Social Security Administration
61 Forsyth Street, S.W., Suite 20T45
Atlanta, Georgia        30303-8920

Susan Roark Waldron
Assistant United States Attorney
400 N. Tampa St., Suite 3200
Tampa, FL               33602

-32-

The Honorable R. Neil Lewis
Administrative Law Judge
c/o Social Security Administration
Office of Hearings and Appeals
Suite 300, Glenridge Building
3505 Lake Lynda Drive
Orlando, FL            32817